### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| SHARON LEIGH JONES, | CASE NO. 1:21-CV-01309-SO |
| Plaintiff, | JUDGE SOLOMON OLIVER, JR. |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Sharon Jones filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On July 7, 2021, pursuant to Local Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of July 7, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

### PROCEDURAL BACKGROUND

Ms. Jones filed for SSI on January 21, 2019, alleging a disability onset date of June 3, 2005. (Tr. 65). Her claims were denied initially and on reconsideration. (Tr. 65-79, 81-96). She then requested a hearing before an Administrative Law Judge. (Tr. 116). Ms. Jones  (represented by

counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on November 20, 2020. (Tr. 36-60). On December 28, 2020, the ALJ issued a written decision finding Ms. Jones not disabled. (Tr. 12-35). The Appeals Council denied Ms. Jones's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 416.1455, 416.1481). Ms. Jones timely filed this action on July 6, 2021. (ECF #1).

FACTUAL BACKGROUND

## I.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Jones was 39 years old at the time of her alleged onset date, and 54 years old at the time of the administrative hearing. (Tr. 28). Ms. Jones completed tenth grade and has a limited education. (Tr. 28, 214). In the past, Ms. Jones has been employed as an automotive parts marketing assistant. (Tr. 215).

## II.    RELEVANT MEDICAL EVIDENCE[1]

On September 20, 2010, urodynamics testing confirmed a diagnosis of Urodynamic Stress Incontinence (USI) with no evidence of Detrusor Overactivity (DO). (Tr. 316). Treatment options included observation, pelvic muscles exercise, duloxetine, Renessa, and surgery. (Id.). Ms. Jones opted for a midurethral sling, which was placed on October 12, 2010. (Tr. 315, 328).

On October 5, 2010, Denise Jackson, M.D., noted Ms. Jones has "known SLE [systemic lupus erythematosus] anticardiolipin antibody syndrome, and antiphospholipid antibody

---

[1]    Ms. Jones claims the RFC determination is unsupported by substantial evidence, specifically relating to the ALJ's evaluation of Dr. Oberhouser's opinion. (Pl.'s Br., ECF #10, PageID 631-34). Ms. Jones submits a Fact Sheet outlining the facts pertinent to her claim. (ECF #10-1). I summarize here the medical evidence relevant to Ms. Jones's claim as submitted in the Fact Sheet. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("we limit our consideration to the particular points that Hollon appears to raise in her brief on appeal").

syndrome . . . chronic proteinuria, and general anxiety disorder." (Tr. 331). Dr. Jackson also noted Ms. Jones "continues to complain of joint pains which are associated with her lupus." (*Id.*). Dr. Jackson assessed Ms. Jones as having "[l]upus which is active in the form of joint pains and fatigue." (Tr. 332).

Ms. Jones discontinued Arthrothec and Volataren because they aggravated her stomach; Ms. Jones asked if there were other medications she could take for her pain besides Tylenol and Motrin multiple times per day. (Tr. 331). Dr. Jackson started Ms. Jones on Ultram 100 mg daily and discontinued the over-the-counter Motrin and Tylenol. (Tr. 332). Dr. Jackson referred Ms. Jones to a rheumatologist. (*Id.*).

A progress note from April 18, 2011, indicated Ms. Jones attended three post-operative therapy sessions from December 22, 2010 to January 3, 2011. (Tr. 325). Ms. Jones placed herself on hold "due to a lupus flare and finding out she has fibromyalgia." (*Id.*). Ms. Jones did not later return. (*Id.*).

Notes from August 28, 2017 indicate Ms. Jones was experiencing urge incontinence; possible explanations included menopause, prior incontinence surgery, obesity, or fibromyalgia. (Tr. 426). Ms. Jones's history is complicated for lupus and fibromyalgia. (*Id.*). Ms. Jones's pelvic muscles were hypertonic and tender to palpation bilaterally. (*Id.*). Ms. Jones's complaints of pelvic muscle spasm were likely related to her fibromyalgia. (Tr. 314, 426).

Notes from October 2, 2017 indicated Ms. Jones was to begin pelvic floor physical therapy for the pelvic hypertonicity, believed to be related to Ms. Jones's fibromyalgia. (Tr. 426). Ms. Jones attended three out of four physical therapy sessions, but stopped due to insurance issues. (*Id.*).

On August 30, 2018, Ms. Jones met with Paul DelBusto, M.D., with Southwest Rheumatology, and complained of right elbow pain, pain with use of her right upper extremity, and intermittent leg cramps and left hand spasm. (Tr. 395). Dr. DelBusto recounted Ms. Jones's history of systemic lupus with anticentromere antibodies, antinucleolar antibodies, polyarticular arthralgias, photosensitivity, skin rashes, and fatigue, as well as a history of false positive syphilis test. (Tr. 398).[2] Dr. DelBusto indicated Ms. Jones has nonalcoholic hepatitis confirmed by liver biopsy. (*Id.*). On examination, Dr. DelBusto found no evidence of inflammation in the hands, wrists, elbows, shoulders, knees, ankles, or feet, but did find diffuse musculoskeletal tender points. (*Id.*). Tenderness was greater at the right lateral than the medial epicondyles. (*Id.*). Dr. DelBusto assessed Ms. Jones with myalgia; nonspecific elevation of transaminase and lactic acid dehydrogenase; SLE (organ or system involvement unspecified, and unspecified); other long-term drug therapy; fatigue; obesity; unspecified abdominal pain; and enthesopathy. (*Id.*). He continued Ms. Jones on hydroxychloroquine sulfate and tramadol. (Tr. 400).

On February 1, 2019, Ms. Jones met with Frances Strulovitch, M.D., complaining of vomiting, chills, fever, dizziness, body aches, cough. (Tr. 353). Dr. Strulovitch assessed Ms. Jones with "other forms of systemic lupus erythematosus" and candida stomatitis. (Tr. 353-54). Dr. Strulovitch also noted past history of fibromyalgia (2012 diagnosis); systemic lupus (2004) affecting kidney, heart, and liver; and beginning stage nonalcoholic fatty liver disease. (Tr. 353).

---

[2]     A false positive result from a syphilis screening can indicate autoimmune diseases such as systemic lupus or rheumatoid arthritis, among other causes. Centers for Disease Control and Prevention, *Syphilis*, *Table 1. Interpretation of Syphilis Serology Tests*, https://www.cdc.gov/ immigrantrefugeehealth/guidelines/domestic/sexually-transmitted-diseases/syphilis.html (last visited July 18, 2022).

On April 12, 2019, Ms. Jones established care with Alexander Kmicikewycz, M.D. (Tr. 455). Dr. Kmicikewycz noted Ms. Jones had SLE and fibromyalgia; she was seeking to treat with a new rheumatologist in order to continue therapy. (*Id.*). Ms. Jones described the presence of diffuse aching pain. (*Id.*). Ms. Jones complained that she had pain "all over" but mostly in her joints. (*Id.*). Dr. Kmicikewycz conducted a mental health screening and found Ms. Jones had moderately severe depression. (*Id.*). Ms. Jones was taking hydroxychloroquine, lorazepam, escitalopram oxalate, tramadol, venlafaxine, aspirin, naproxen, and vitamin C. (Tr. 456). Dr. Kmicikewycz assessed Ms. Jones with SLE, fibromyalgia, and nonalcoholic fatty liver disease. (Tr. 457). He continued Ms. Jones on her medications, increased her tramadol dosage and started her on gabapentin. (Tr. 458).

On April 12, 2019, Dr. Kmicikewycz requested an antinuclear antibodies (ANA) that revealed speckled cytoplasmic fluorescence. (Tr. 493). The antibodies noted in this pattern are associated with (but not limited to) primary biliary cirrhosis (PBC), polymyositis and dermatomyositis (PM/DM), and SLE. (*Id.*).

Bone mineral density testing on April 23, 2019 showed Ms. Jones to be osteopenic with a moderate fracture risk. (Tr. 501).

On December 11, 2019, Ms. Jones treated with Megan Oberhauser, D.O., after a recent move to Ohio from Chicago, Illinois. (Tr. 553). Dr. Oberhauser noted Ms. Jones's history of SLE, fibromyalgia, and nonalcoholic fatty liver disease, among others. (*Id.*). Dr. Oberhauser also noted Ms. Jones had been seeing a rheumatologist for lupus, and was taking on Plaquenil (hydroxychloroquine) and gabapentin and tramadol for pain. (*Id.*).

On May 21, 2020, Ms. Jones treated with Dr. Oberhauser via telehealth. (Tr. 548-49). Ms. Jones reported arthralgia and joint stiffness, but no myalgia, back pain, joint swelling, or limb

swelling. (Tr. 549). Ms. Jones reported she was unable to see her new rheumatologist due to COVID-19; Dr. Oberhauser re-sent the referral to the rheumatologist. (*Id.*). Dr. Oberhauser started Ms. Jones on meloxicam and continued her on Plaquenil. (*Id.*). Dr. Oberhauser recommended follow-up in three months.

On November 3, 2020, Ms. Jones attended a follow-up telehealth appointment with Dr. Oberhauser, which included a discussion of her disability paperwork. (Tr. 560). Ms. Jones reported extreme fatigue and an inability to complete housework without stopping and taking breaks every ten or fifteen minutes; even going to the grocery store is exhausting. (Tr. 561). Increased stress adds to chronic fatigue and joint pain. (*Id.*). Ms. Jones reported she cannot stand, walk, bend, lift, or squat for any extended period of time. (*Id.*). Ms. Jones reported she cannot sit for fifteen minutes without adjusting. (*Id.*). Ms. Jones also struggles with anxiety at times, making it difficult for her to be in crowds. (*Id.*). Dr. Oberhauser noted joint stiffness, limb pain and limb swelling, as well as tiredness. (*Id.*).

### III.  MEDICAL OPINIONS

#### A.    State Agency Reviewers

State agency medical consultants reviewed Ms. Jones's record at the initial and reconsideration levels.

On May 7, 2019, Judith Kelly, M.D., reviewed Ms. Jones's medical records and determined Ms. Jones able to lift/carry twenty pounds occasionally and ten pounds frequently. (Tr. 74). Dr. Kelly also determined Ms. Jones could stand/walk for a total of six hours in an eight-hour day. (*Id.*). Dr. Kelly noted Ms. Jones's sustainability was limited due to her history of SLE, fibromyalgia,

and nonalcoholic liver disease with early cirrhosis. (*Id.*). Dr. Kelly opined Ms. Jones could perform light work. (Tr. 78).

On May 28, 2019, Michael Cremerius, Ph.D. reviewed Ms. Jones's records and noted mild limitation in understanding, remembering, and applying information and in adapting and managing herself; and moderate limitation in interacting with others and in concentrating, persisting, and maintaining pace. (Tr. 71-72). Dr. Cremerius opined complex instruction was precluded, but Ms. Jones had the cognitive capacity to understand and remember simple and detailed instruction. (Tr. 75). Similarly, Ms. Jones was capable of performing simple and detailed tasks, but complex tasks were precluded. (Tr. 76). Dr. Cremerius opined Ms. Jones was limited to brief and superficial contact with her coworkers and supervisors, and no contact with the public. (*Id.*). Dr. Cremerius found Ms. Jones limited to adapting only to routine changes in the workplace, no fast-paced tasks with strict production quotas, but variable-paced tasks with end of day production quotas were acceptable. (Tr. 77).

On October 23, 2019, Young-Ja Kim, M.D., reviewed Ms. Jones's record on reconsideration. (Tr. 91-96). Dr. Kim opined the same limitations as Dr. Kelly. (Tr. 90-91).

Also on reconsideration, Howard Tin, Psy.D., reviewed Ms. Jones's records and found Ms. Jones had mild limitation in understanding, remembering, and applying information and in adapting and managing herself; and moderate limitation in interacting with others and in concentrating, persisting, and maintaining pace. (Tr. 89-94). Dr. Tin opined to the same non-exertional limitations as Dr. Cremerius, noting no worsening of impairments. (Tr. 92-94). In Dr. Tin's opinion, Ms. Jones could perform one- and two-step tasks. (Tr. 94).

**B.     Dr. Oberhauser**

On November 16, 2020, Dr. Oberhauser completed a physical medical source statement in which she noted a "fair" prognosis for Ms. Jones's diagnoses of fibromyalgia, systemic lupus, and anxiety. (Tr. 556-59). Dr. Oberhauser described Ms. Jones as having "migratory joint pain," at times ten on a ten point scale, and worse with increased stress, anxiety, and shortness of breath with exertion. (*Id.*). Dr. Oberhauser noted clinical findings and objective signs of "blood work consistent w[ith] lupus and active joint inflammation on exam." (*Id.*). Ms. Jones was treated with Plaquinel for lupus and Lexapro daily for anxiety. (*Id.*).

In Dr. Oberhauser's opinion, Ms. Jones could sit for fifteen minutes and stand for ten minutes at a time, and sit/stand/walk for less than two hours in an eight-hour workday. (Tr. 557). Ms. Jones required periods of walking around every twenty minutes for five minutes or less, with unscheduled breaks every hour for fifteen minutes. (*Id.*). Ms. Jones could occasionally lift/carry up to ten pounds but never lift/carry more than that. (Tr. 558). Ms. Jones could use her bilateral upper extremities 25% of the workday for grasping, turning, twisting, and fine manipulation, but only 5% of the time for reaching in front and overhead. (*Id.*). Ms. Jones would likely be off-task at least 25% of the workday. (*Id.*). She was incapable of performing even low-stress work. (Tr. 558). Ms. Jones would likely be absent from work more than four days per month. (Tr. 559).

Dr. Oberhauser indicated Ms. Jones's impairments (as demonstrated by signs, clinical findings, and laboratory or test results) were reasonably consistent with the opined functional limitations. (*Id.*). Dr. Oberhauser further described Ms. Jones's limitations as "extreme changes in

temperatures/humidity can worsen joint pain related to lupus. [Ms. Jones] must avoid dusty environ or fumes due to emphysema." (*Id.*).

### C.   Dr. Higdon

On April 25, 2019, Laura Higdon, Ph.D., conducted a psychological evaluation of Ms. Jones for the Bureau of Disability Determination Services (DDS). (Tr. 526). Ms. Jones drove herself to the appointment. (*Id.*). Dr. Higdon noted a "somewhat sullen" demeanor, but otherwise Ms. Jones's demeanor and behavior was appropriate for the evaluation. (*Id.*). Ms. Jones reported diagnoses of lupus and fibromyalgia and pain on a daily basis. (*Id.*). Ms. Jones reported she last worked in 2004, but after having her son, after 2004, became ill and received her diagnosis in 2005. (Tr. 526-27).

Ms. Jones endorsed depression, worsened by her physical issues. (Tr. 527). Ms. Jones reported poor sleep, variable appetite, and poor energy and motivation. (*Id.*). Ms. Jones has participated in psychotherapy since 2006. (*Id.*).

Ms. Jones reported struggling with her activities of daily living because of motivational issues. (*Id.*). Ms. Jones reported difficulty getting up in the morning and needing to rest after activities; she used to dance and bake but cannot any longer due to physical issues. (Tr. 527-28).

On examination, Ms. Jones exhibited motor slowing and stiffness. (Tr. 527). Her affect and mood were sad and anxious. (*Id.*). Dr. Higdon assessed Ms. Jones with adequate cognitive functioning, despite a long history of depression and social anxiety. (Tr. 529).

### D.   Dr. Shah

On April 25, 2019, Mahesh Shah, M.D., conducted an Internal Medicine Consultative Examination for DDS. (Tr. 531). Dr. Shah reviewed Ms. Jones's past medical records, including a report from a rheumatologist. (*Id.*). Ms. Jones drove herself to the testing office. (*Id.*).

Ms. Jones reported she began experiencing severe fatigue in 2004 after having a child. (*Id.*). She would develop a rash if she went outside into the sunlight. (*Id.*). After meeting with a doctor and having a blood test, she was diagnosed with lupus and was prescribed Plaquenil. (*Id.*). Ms. Jones had to discontinue Plaquenil during her second pregnancy in 2006; at this time, her liver and kidney functions began deteriorating. (*Id.*). Ms. Jones restarted her lupus medications after delivery, and also began taking prednisone for pain control without relief. (*Id.*). Ms. Jones's rheumatologist diagnosed her with fibromyalgia because prednisone did not relieve her pain. (*Id.*). Ms. Jones reported being unable to do physical activities or to stand or walk for long periods. (*Id.*).

In 2015, blood test and ultrasound revealed nonalcoholic fatty liver disease with early cirrhosis; Ms. Jones experiences mild pain in her right flank but denied other symptoms. (Tr. 532).

Ms. Jones was able to move around slowly during the examination without an assistive device. (*Id.*). She was able to get up from a chair and onto the examination table; she could go from sitting to supine and back without difficulty. (*Id.*). Ms. Jones had mild tenderness in her neck and lumbar region. (Tr. 533). Ms. Jones exhibited full range of motion of the lumbar spine. (*Id.*). Joint examination revealed mild, vague tenderness without swelling or deformity. (Tr. 534). Range of motion was slow but preserved in all joints of the upper and lower extremities. (*Id.*). Motor strength was 5/5 in both upper and lower extremities. (*Id.*).

Dr. Shah presented the following clinical impressions: history of lupus with liver and kidney involvement; fibromyalgia; nonalcoholic liver disease with early cirrhosis, stable at present; mental issues. (*Id.*).

IV.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Jones and VE Melissa Hennessey, presented during the hearing before the ALJ.

Ms. Jones testified she has daily pain in her joints, the back of her neck, her back, her hips, and her knee. (Tr. 42). She also experiences nerve pain. (*Id.*). Her pain is usually a six to an eight on a ten-point scale. (Tr. 43). Ms. Jones takes Mobic, anti-inflammatories, and an over-the-counter cream for the pain; she has attempted other pain medications but stopped because of the damage they cause. (*Id.*). Ms. Jones also takes hydroxychloroquine. (*Id.*).

Physical activity and weather changes exacerbate Ms. Jones's pain. (*Id.*). Ms. Jones can do chores such as prepare packaged meals or wash the dishes. (Tr. 43-44). But she cannot do "large chores" such as vacuuming; she can vacuum one room at a time, for five minutes before needing to stop and rest. (Tr. 44). She has difficulty shopping for groceries and carrying them into the house; her roommate carries in the groceries after she shops for herself. (Tr. 45-46).

Ms. Jones is not always able to venture outside of the house if it is damp or sunny. (Tr. 46). Some days she is unable to leave her bed due to depression stemming from her pain. (*Id.*). She can only stand for thirty to forty-five minutes and can only walk for five to fifteen minutes before resting. (Tr. 46-47). Ms. Jones has difficulty navigating steps and lives in a single-story residence without stairs. (Tr. 47). She can only lift about five pounds and has difficulty reaching. (*Id.*). She has weak joints in her wrists, swollen knuckles, and cannot grip things well. (*Id.*).

Ms. Jones also has depression for which she takes Lexapro. (Tr. 47-48). She receives counseling, and treated with a specialist in Illinois, before she moved to Ohio. (Tr. 48). Ms. Jones has difficulty sleeping and only gets about four hours of restful sleep per night. (*Id.*). She has crying

spells a few times a week. (Tr. 49). Ms. Jones also endorsed some difficulty when following instructions. (*Id.*).

Ms. Jones experiences anxiety and has a couple of panic attacks each week. (Tr. 50). Sometimes she experiences involuntary urination or bowel movements during an anxiety attack. (Tr. 50).

The VE then testified. The ALJ presented the following hypothetical: Assume a hypothetical individual of the same age, education, and work experience as Ms. Jones, but with additional limitations to the light range of work, lifting up to twenty pounds occasionally and ten pounds frequently; standing and walking for six out of eight hours, sitting for six out of eight hours, with normal breaks; occasionally stoop; frequently handle and reach bilaterally in all directions; can tolerate occasional exposure to weather; can perform simple, routine tasks but not at a production rate pace, where tasks must be performed quickly, or tasks that require strict production quotas such as assembly-line work; any time off-task can be accommodated by normal breaks; the individual can frequently interact with supervisors, coworkers, and the public, incidental to the work being performed (working more with things rather than people), no group or team-based activities. (Tr. 53-54). In response to this hypothetical, the VE identified three examples: Marker, DOT 209.587-034, light, SVP 2, 129,000 jobs in the national economy; Cafeteria Attendant, DOT 311.677-010, light, SVP 2, 129,000 jobs in the national economy; and Cleaner/Housekeeper, DOT 323.687-014, light, SVP 2, 220,000 jobs in the national economy. (Tr. 54).

The VE testified these jobs would not be affected if the individual required postural limitations to alternate positions every twenty or thirty minutes for one to two minutes while

remaining at a workstation. (Tr. 54-55). The representative jobs would remain if the individual were limited to occasional interaction with the public, coworkers, and supervisors. (Tr. 56).

The VE further testified that if an individual were off-task fifteen percent or more of the workday, it would be work-preclusive. (Tr. 55). An employer would reprimand an employee who was absent, arrived late, or left early from work one or two days per month. (Tr. 56). If the absenteeism continued on a consistent basis, an employer may terminate an employee who had six or seven absences within a one-year period. (*Id.*).

The VE testified the SVP level refers to the amount of time it takes to learn a job. (Tr. 57). If the individual was limited to simple, routine work, it would preclude the ability to carry out detailed written and oral instructions. (*Id.*). And the GED reasoning scale reflects the aspects of education that are required for satisfactory job performance and contribute to the person's reasoning, development, and ability to follow instructions. (*Id.*).

The VE also clarified that the cleaner job, as with others in the light work category, would afford little time for seated work. (Tr. 58). Light jobs mainly are standing and walking positions; a cleaner may only be able to sit while detail cleaning something. (Tr. 57-58). The three jobs identified would require the individual to be on his or her feet for five-and-a-half to six hours per workday. (Tr. 58). The individual could not sit for two hours as a cleaner and remain competitive. (*Id.*). The three jobs identified could not be performed if the individual were limited to handling and fingering 25% of the workday, because they require frequent reaching and handling. (Tr. 58-59).

### THE ALJ'S DECISION

The ALJ's decision, dated December 28, 2020, included the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since January 21, 2019, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: systemic lupus erythematosus (SLE); fibromyalgia; panlobular emphysema; obesity; dysthymia, major depressive disorder; social anxiety. (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except occasionally stoop, frequently handle bilaterally; frequently reach in all directions bilaterally; can tolerate occasional exposure to weather; can alternate/change positions every 30 minutes for one to two minutes while remaining at the workstation, and no change in work process; can perform simple, routine, tasks, but cannot perform production rate pace work where tasks must be performed quickly or require strict production quotas like assembly line work; time off task can be accommodated by normal breaks; occasional interaction with supervisors, coworkers, and the public, incidental to work being performed, working more with things rather than people, and no group or team-based activities.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on October 6, 1966 and was 52 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

14

national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since January 21, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference.

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.     Was claimant engaged in a substantial gainful activity?

2.     Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Jones argues the ALJ's RFC determination is not supported by substantial evidence because the ALJ did not properly evaluate Dr. Oberhauser's opinion. (Pl.'s Br., ECF #10, PageID 631). Ms. Jones takes issue with the ALJ finding Dr. Oberhauser's opinion unpersuasive because it appeared (in the ALJ's view) to be based largely on Ms. Jones's subjective reports. (*Id.* at PageID 632). Ms. Jones asserts the ALJ's explanation that Ms. Jones's diagnoses of SLE and fibromyalgia

17

were merely "self-reported" is a mischaracterization of her impairments and harmful error. (*Id.* at PageID 632-33).

The Commissioner opposes, arguing that substantial evidence supports the ALJ's determination that Ms. Jones could perform a reduced range of light work despite her physical limitations. (Comm'r's Br., ECF #13, PageID 654). The Commissioner then points to normal examination findings, such as range of motion, strength, gait, and other unremarkable results, and that Ms. Jones at times denied significant symptoms of her illnesses. (*Id.* at PageID 654-55). The Commissioner also notes the ALJ considered Ms. Jones's reported activities of daily living when forming the RFC. (*Id.* at Page ID 655-56). In all, the Commissioner asserts the ALJ appropriately considered and explained her findings in accordance with the regulations. (*Id.* at 656-69).

I conclude that the ALJ mis-stepped when initially considering Ms. Jones's diagnoses as "self-reported." Sixth Circuit precedent is clear that these diagnoses, particularly fibromyalgia, elude conclusive objective findings and are often based on a claimant's subjective statements. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245 (6th Cir. 2007). Without a proper consideration at that stage of the analysis, the RFC fails. For the reasons that follow, I recommend remand.

## I.     The ALJ erred by characterizing Ms. Jones's fibromyalgia and SLE as "self-reported diagnoses."

Ms. Jones argues the ALJ's explanation of Dr. Oberhauser's opinion is insufficient because the ALJ's evaluation was premised on a mischaracterization of SLE and fibromyalgia as "self-reported diagnoses." (Pl.'s Br., ECF #10, PageID 633). The Commissioner counters that Ms. Jones "ignores the fact that the ALJ identified both Plaintiff's SLE and fibromyalgia as severe impairments." (Comm'r's Br., ECF #13, PageID 659). The Commissioner further argues the ALJ did not err in the RFC when evaluating Ms. Jones's treatment records from multiple

18

rheumatologists for her SLE and fibromyalgia and properly articulated her reasoning in accordance with the regulations. (*Id.* at PageID 658-59).

Identifying SLE and fibromyalgia as severe impairments at Step Two of the sequential evaluation is not relevant to and does not save the ALJ's error in characterizing SLE and fibromyalgia as "self-reported diagnoses." (Tr. 22). Step Two severity regulations have been construed as a *de minimis* hurdle for the claimant to clear in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Under these regulations, an impairment is determined "not severe" if it does not "significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). An ALJ is required to consider both severe and non-severe limitations and their effects on the claimant to create an RFC that meaningfully considers the claimant's remaining capacity for work. *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 326 (6th Cir. 2015). But an RFC does not "meaningfully consider" a claimant's capacity for work where that consideration is premised on a mischaracterization of the claimant's severe impairments.

**Fibromyalgia.** Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244 n.3; *see also* SSR 12-2p. Physical and neurological examinations typically yield normal results. *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988). There are no laboratory tests to confirm its presence or severity; fibromyalgia's "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996). Because of the unique difficulties associated with the diagnosis and treatment of fibromyalgia, "opinions that focus solely upon objective evidence are not particularly relevant."

*Rogers,* 486 F.3d at 245. Application of the usual disability analysis with its focus on objective evidence is not appropriate in cases involving fibromyalgia. *Id.* at 243-46. This places a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis. *Swain v. Comm'r of Soc. Sec.,* 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003).

The Sixth Circuit and district courts within it will remand where an ALJ dismisses a claimant's subjective statements in favor of objective findings when considering fibromyalgia. *See, e.g., Rogers,* 486 F.3d at 244 ("[T]he ALJ's decision here impliedly dismissing or minimizing Rogers' fibromyalgia and instead accepting the non-treating doctors' opinions as to her limitations from 'arthralgias' was not based upon substantial evidence."); *see also Minor v. Comm'r of Soc. Sec.,* 513 F. App'x 417, 435 (6th Cir. 2013) (remanding where the ALJ dismissed the claimant's subjective complaints of pain in favor of non-treating source opinions and failed to discuss the accepted medical standard for diagnosing fibromyalgia); *Kalmbach v. Comm'r of Soc. Sec.,* 409 F. App'x 852, 865 (6th Cir. 2011) (remanding where the ALJ failed to give good reasons for rejecting treating physicians' opinions and discredited the claimant's subjective statements of their fibromyalgia symptoms); *Preston v. Sec'y of Health & Hum. Servs.,* 854 F.2d 815, 819-20 (6th Cir. 1988) (finding substantial evidence lacking and remanding with an award of benefits where the ALJ relied on normal clinical and test results as evidence of non-disability for fibromyalgia); *Lower v. Comm'r of Soc. Sec.,* No. 1:19 CV 2071, 2020 WL 5215391, at *11 (N.D. Ohio Aug. 17, 2020) ("[T]he ALJ gave no specific evaluation of the limiting effects of Plaintiff's fibromyalgia condition, relied solely on objective evidence in assessing her credibility, and improperly dismissed the opinion of the physician treating her fibromyalgia. Thus, remand is necessary for the ALJ to

properly evaluate such."), *report and recommendation adopted Lower v. Comm'r of Soc. Sec. Admin.*, 2020 WL 5203487 (N.D. Ohio Sept. 1, 2020).

Here, the ALJ explicitly rejected Ms. Jones's fibromyalgia and SLE diagnoses as self-reported or otherwise not corroborated by objective findings:

- Nevertheless, the claimant self-reports diagnoses of lupus (SLE) and fibromyalgia, as well as experiencing lifelong depression, worsened by her daily pain. During the relevant period, the evidence shows that the claimant saw a rheumatologist twice in 2018, upon which, such diagnoses remain largely based on claimant's self-reports, without corroboration by objective findings in the medical evidence of record. (Tr. 22);

- February 2018 physical exams with rheumatology were overall normal, as the claimant denied common symptoms of SLE or fibromyalgia, including muscle pain, aches, cramps, or weakness; paralysis, or numbness and tingling in the extremities; hand, ankle or other joint swelling. However, the claimant did allege back and neck pain, but did not allege any balance deficits. Consistently, upon physical examination, the claimant's extremities were normal, there was no nodules, swelling, psoriasis, digital ulcers, or other common objective findings corroborating alleged symptoms. (Tr. 23) (internal citations omitted);

- Similarly, August 2018 rheumatology exams continue to fail to corroborate continued physical complaints, including right upper extremity pain with hand movements. Although the claimant was noted with diffuse musculoskeletal tender points, as well as tenderness in the elbow area (right lateral greater than medial epicondyles), there was otherwise no evidence of synovitis (joint inflammation) in the claimant's hands, elbows, shoulders, knees, ankles, or feet. (*Id.*);

- Shortly after filing for disability, it was not until April 2019, that the claimant established care with rheumatologist, Dr. Alexander Kmicikewycz, whose findings remained benign, despite continued complaints of all over bodily pain, mostly affecting the joints. (Tr. 24) (internal citations omitted);

- Contrarily, physical exams with rheumatology continued to be overall normal. There were no neck or back deficits, despite hearing allegations of pain mainly affecting those areas. Also upon examination, the claimant's gait was noted to be stable, and her extremities exhibited good range of motion. (*Id.*);

- Twice more, in July 2019 and August 2019, the claimant returned for rheumatology follow-ups, with overall normal physical exams, with few deficits, wholly contrary to continued complaints. (*Id.*);

- Consistent with treatment records, a few months earlier, the claimant exhibited few deficits at her April 2019 physical consultative exam. She was noted with the ability to bear her own weight, and walk without an assistive device, albeit slowly. She had difficulty heel walking, toe walking, and squatting. She was able to get up from a chair, as well as on and off the exam table. She was able to go from sitting to supine position, and get up from a supine position without difficulty. She had mild tenderness in her neck, but with full range of motion of the cervical spine. She also had mild tenderness in the lumbar region, but without range of motion deficits. There were no deformities or paraspinal muscle spasms. It was noted that she had driven herself to the office unaccompanied, further contradicting major allegations of back and neck deficits, as well as upper extremity deficits, including in her hands and wrists. (*Id.*);

- Physical examinations consistently show no extremity deficits, which exhibited 5/5 strength, although examinations of the joints showed mild, vague tenderness without swelling or deformity of any joint. The claimant's range of motion was slow, but preserved throughout the upper and lower extremities. Her hand grip and finger grasp was normal. Fine and gross manipulations were also normal. (*Id.*).

The ALJ's articulated reasons for rejecting Ms. Jones's fibromyalgia diagnosis as "self-reported" (Tr. 22) and otherwise not supported by objective findings such as exhibiting normal strength and range-of-motion testing (Tr. 23-24) do not constitute substantial evidence supporting the ALJ's RFC finding. *See Rogers*, 486 F.3d at 243-44. This is further exacerbated by the ALJ's rejection of the type of findings used to evaluate fibromyalgia, such as "all over bodily pain" (Tr. 24) or "diffuse musculoskeletal tender points." (Tr. 23). *See id.*; *see also Swain*, 297 F. Supp. 2d at 990. I therefore recommend remand on this basis.

**Lupus.** Moreover, with respect to SLE, the ALJ compounds this separate diagnosis with the co-occurrence of fibromyalgia, also rejects it as self-reported, and states that providers treated certain objective tests as not conclusive: "Although the record does, indeed show positive anti-

nuclear antibodies (ANA), no treatment provider, including the claimant's treating rheumatologists, equate such findings as conclusive evidence that the claimant has a diagnosis of SLE." (Tr. 22). Although I read the ALJ's opinion "as a whole and with common sense," *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010), I observe a general discussion of rheumatology records but no particularized analysis of SLE apart from the flawed fibromyalgia evaluation discussed above. (*See* Tr. 18, 21-28).

Moreover, the ALJ's statement that Ms. Jones's treatment providers do not "equate [positive ANA] findings as conclusive evidence that the claimant has a diagnosis of SLE" (Tr. 22) is another mischaracterization not borne out by the record. In making this assertion, the ALJ cites to the lab reports, not the doctor's treatment notes. (*Compare* Tr. 22 *with* Tr. 318, 467). The lab report does include this statement: "Speckled cytoplasmic fluorescence is present. The antibodies noted in this pattern may be associated with, but not restricted to, primary biliary cirrhosis (PBC), polymyositis and dermatomyositis (PM/DM), and/or systemic lupus erythematosus (SLE)." (Tr. 467). However, Ms. Jones's treatment providers do note Ms. Jones's history of SLE, including other objective signs,[3] such as the positive ANA findings, photosensitivity, polyarticular arthralgias, skin rashes, fatigue, proteinuria, false positive syphilis test, and Reynaud's phenomenon. (Tr. 353, 398). Multiple providers have prescribed Ms. Jones medication to treat her SLE. (Tr. 353-54, 400,

---

[3]     Objective diagnostic signs for SLE have changed over time and can include positive ANA testing, fever, rashes, photosensitivity, oral ulcers, joint involvement, pleuritis, renal disorder, neurologic disorder, hematologic disorder, immunologic disorders, or false-positive syphilis tests. *See Crouch v. Sec'y of Health & Hum. Servs.*, 909 F.2d 852, 854 (6th Cir. 1990); *see also* Aringer et al, *American College of Rheumatology Classification Criteria for Systemic Lupus Erythematosus*, https://www.rheumatology.org/Portals/0/Files/Classification-Criteria-Systemic-Lupus-Erythematosus.pdf, and *Supplementary Table 1*, https://www.rheumatology.org/Portals/0/Files/Classification-Criteria-Systemic-Lupus-Erythematosus-Table-1.pdf (last visited July 19, 2022).

456-58, 549, 553). Dr. Kmicikewycz, the doctor who ordered the ANA testing, found Ms. Jones had SLE and prescribed her medications to treat it. (*Compare* Tr. 493 *with* 457-58). This reading of the record discloses that Ms. Jones's providers did consider her to have, and need treatment for, SLE. The assertion that Ms. Jones's treatment providers did not consider the positive ANA test results to be conclusive evidence fails to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877. I therefore recommend remand.

It may be that Ms. Jones's impairments from fibromyalgia or SLE are not disabling. *See Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 755 (6th Cir. 2012); *Crouch v. Sec'y of Health & Hum. Servs.*, 909 F.2d 852, 854 (6th Cir. 1990). But the ALJ's treatment and explanation of Ms. Jones's co-occurring diagnoses is in error and prevents my meaningful review. I therefore recommend remand.

## II.    The flaw in the analysis of Ms. Jones's fibromyalgia and SLE leads to a flawed analysis of Dr. Oberhauser's opinion evidence.

As Ms. Jones asserts, the ALJ's error treating her fibromyalgia and SLE as "self-reported" is harmful, and the mischaracterization led to the ALJ's faulty analysis of Dr. Oberhauser's opinion, a flawed RFC, and, ultimately, to a finding of non-disability. (*Id.* at PageID 633-34). The Commissioner counters that the ALJ did not err, appropriately resolved any conflicts in the opinions of record, and points to normal examination findings and Ms. Jones's activities of daily living to demonstrate substantial evidence supported the ALJ's decision. (Comm'r's Br., ECF #13, PageID 654-58). But, specific to fibromyalgia, the Commissioner's "contention that the treating physicians' assessments and opinions were unsupported by other objective medical evidence [i]s simply beside the point." *Kalmbach*, 409 F. App'x at 862.

For claims filed on or after March 27, 2017, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b). An ALJ is no longer bound by the "treating physician rule," and so was not required to find Dr. Oberhauser's opinion persuasive. *Id.* at § 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[4] and consistency.[5] *Id.* at § 416.920c(b). An ALJ must explain how the ALJ considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2), (3), 416.920c(b)(2), (3).

The determination of an individual's residual functional capacity is an issue reserved for the Commissioner.[6] 20 C.F.R. § 416.920b(c)(3)(vi). Even so, substantial evidence must support the

---

[4] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

[6] The Commissioner avers that Dr. Oberhauser's opinion "regarding absences and breaks at a work-preclusive frequency are essentially 'tantamount to a disability opinion' and should therefore be treated the same as other issues reserved to the Commissioner," (Comm'r's Br., ECF #13, PageID 559), *i.e.*, ignored as "evidence that is inherently neither valuable nor persuasive." 20 C.F.R. § 416.920b(c). A medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other

Commissioner's residual functional capacity finding. *Berry v. Astrue,* No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). And despite the Commissioner's argument that substantial evidence supports the ALJ's decision (Comm'r's Br., ECF #13, PageID 654), "'substantial evidence alone does not excuse non-compliance with [the regulations] as harmless error.'" *Ledsome v. Comm'r of Soc. Sec.,* 5:20-CV-02495, 2021 WL 6101427, *7 (N.D. Ohio Dec. 8, 2021), *report and recommendation adopted,* 2021 WL 6086452 (N.D. Ohio Dec. 23, 2021) (quoting *Hardy v. Comm'r of Soc. Sec.,* 554 F. Supp. 3d 900, 908 (E.D. Mich. Aug. 13, 2021).

But while the ALJ is not required to find a treating physician's opinion persuasive, the ALJ is required to provide *justifiable* reasons for rejecting the opinion. *See Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 408 (6th Cir. 2009). And, "[b]ecause of the greater latitude afforded ALJs under the new regulations, the importance of cogent explanations is perhaps even more important." *Hardy,* 554 F. Supp. 3d at 908. The ALJ is required to say enough in the decision to allow this Court to trace the path of reasoning. *See Stacey v. Comm'r of Soc. Sec.,* 451 F. App'x 517, 519 (6th Cir. 2011).

A court may conclude an ALJ's procedural error was harmless in some circumstances, including for example, when an opinion is so patently deficient that the Commissioner could not possibly credit it; the Commissioner adopts a treating source opinion or makes findings consistent with the opinion; or the Commissioner has met the goal of the regulations even without

---

demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2). A medical opinion containing statements regarding a claimant's time off-task or absent are not *per se* statements regarding the ultimate question of disability. *See Sharp v. Barnhart,* 152 F. App'x 503, 510 (6th Cir. 2005) ("Nor are we aware of any regulatory or case support for the third explanation given by the ALJ—that "the issue of disability based upon frequent absenteeism . . . remains an issue reserved to the Commissioner."). I am thus not persuaded by the Commissioner's undeveloped argument in this regard.

complying with its terms. *Wilson,* 378 F.3d at 547; *see also Hardy,* 554 F. Supp. 3d at 909 (applying *Wilson's* harmless error doctrine to an ALJ's failure to evaluate medical opinions properly under the revised regulations); *accord Moulden v. Kijakazi,* No. 1:20-CV-00152, 2022 WL 178588, *7 (W.D. Ky. Jan. 19, 2022). But an ALJ's failure to follow agency procedures is not harmless error when it prevents this Court's meaningful review. *Blakley,* 581 F.3d at 408; *see also Shields v. Comm'r of Soc. Sec.,* 732 F. App'x 430, 440 (6th Cir. 2018).

> Here, the ALJ provided the following explanation regarding Dr. Oberhauser's opinion:

> Dr. Oberhauser's opinions, at Exhibit B19F, are not persuasive as they appear to be largely based on the claimant's subjective reports, and are inconsistent with the overall minimal deficits noted in this provider's own treatment records, which also document routine follow-ups, during which medications were refilled or only adjusted minimally. In addition, the claimant established care with this provider less than a year ago, in December 2019, her chief complaint, at that time, unrelated to those presented as reasons for disability (urinary tract infection). Records further note that the claimant's alleged worsening of symptoms were not presented to Dr. Oberhauser until November 2020, just a few weeks prior to her disability hearing, without any reasonable explanation in the objective medical evidence of record for such sudden and drastic decline in physical and mental functioning.

(Tr. 28) (internal citations omitted).

> Although couched in Social Security regulation terminology such as the alleged inconsistency with Dr. Oberhauser's own records, the ALJ's analysis starts with the same fatal flaw as before: "Dr. Oberhauser's opinions . . . are not persuasive as they appear to be largely based on the claimant's subjective reports. . . " (*Id.*).

> Sixth Circuit case law requires the ALJ to give "due consideration" to a claimant's diagnosis of severe fibromyalgia. *Minor,* 513 F. App'x at 434 (collecting cases). And an ALJ's "hesitancy" in identifying fibromyalgia as a severe impairment can, in turn, influence the ALJ's

27

evaluation of medical opinion evidence. *Rogers*, 486 F.3d at 243. It appears that occurred here with respect to the ALJ's consideration of Dr. Oberhauser's opinion.

"Supportability depends on the reasons actually given by the medical source, not those the ALJ imputes on her." *Todd v. Comm'r of Soc. Sec.*, No. 3:20-cv-1374, 2021 WL 2535580, *7 (N.D. Ohio June 3, 2021), *report and recommendation adopted*, 2021 WL 2530846 (N.D. Ohio June 21, 2021). Looking to Dr. Oberhauser's opinion (Tr. 556-59), Dr. Oberhauser explains that Ms. Jones had established care in December 2019, and had been previously diagnosed with fibromyalgia, lupus, and anxiety. (Tr. 556). Dr. Oberhauser also provided Ms. Jones's symptoms, among others, as "chronic pain, chronic excessive fatigue, joint pain", and described the pain as "migratory joint pain, 10/10 at times, worse w[ith] increased stress, too much activity . . . ." (*Id*.). Dr. Oberhauser described clinical findings and objective signs as "blood work consistent w[ith] lupus, active joint inflammation on exam." (*Id*.).

I do not dispute that Dr. Oberhauser must rely on Ms. Jones's subjective reports when forming a medical opinion regarding fibromyalgia pain or certain lupus symptoms. But it is an overstatement that Dr. Oberhauser based her opinion on Ms. Jones's own reports. Rather, Dr. Oberhauser provides a brief description of Ms. Jones's medical history, objective findings to confirm the past diagnoses, and current symptomology in support of her opined limitations. (*See* Tr. 556-59).

Because the ALJ did not provide due consideration to Ms. Jones's diagnoses of fibromyalgia and SLE, substantial evidence does not support her findings. I therefore recommend the District Court remand with instruction to the ALJ to reconsider Ms. Jones's severe

impairments of fibromyalgia and SLE in accordance with this Report and Recommendation,

including reevaluation of the RFC and reconsideration of Dr. Oberhauser's opinion.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **REVERSE** the Commissioner's decision denying supplemental

security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: July 20, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ.
P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted
objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the
forfeiture or waiver of the right to raise the issue on appeal, either to the district
judge or in a subsequent appeal to the United States Court of Appeals, depending
on how or whether the party responds to the Report and Recommendation.
*Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific
and not merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018
WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509).

The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).